225 F.Supp. 300 (1964)
The KROGER CO., a corporation, The Great Atlantic & Pacific Tea Company, Inc., a corporation, and National Food Stores, Inc., a corporation, Plaintiffs,
v.
Nicholas M. BLASSIE, Otto Etzel, Edward J. Schnuck, Albert Wagenfuehr, Rt. Rev. Monsignor John W. Miller, James Mathews, as Trustees of Local 88, Meat and Related Industries Welfare Fund, Defendants.
No. 62 C 4 (1).
United States District Court E. D. Missouri, E. D.
January 8, 1964.
*301 J. Terrell Vaughan and Wm. H. Webster, Armstrong, Teasdale, Roos, Kramer & Vaughan, St. Louis, Mo., for plaintiffs.
Harry H. Craig, St. Louis, Mo., for defendants Blassie, Mathews & Etzel.
Harold A. Thomas, Jr., Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, Mo., for defendant Wagenfuehr.
Christian B. Peper, St. Louis, Mo., for defendant Miller.
John D. Flynn, St. Louis, Mo., for defendant Schnuck.
HARPER, Chief Judge.
The "Wholesale Meatcutters and Butcher Workmen, Local 88 and Metropolitan St. Louis Meat Dealers' Welfare Fund" was established by the original Trust Agreement in January of 1953. Subsequently, the name was changed to "Local 88 Meat and Related Industries Welfare Trust Fund" (hereinafter referred to as the 88 Welfare Trust). The provisions of the original trust agreement were thereafter amended on numerous occasions. The last amendment of substance was made in December, 1958, when the entire agreement and declaration of trust was rewritten (Plaintiffs' Exhibit 2). Such amendment purported to be a compilation of previous amendments. Thereafter, there was only one amendment (October 15, 1959), the purpose of which was to strike out the word "pensions", prior to the beginning of the trial.
Initially, only the employees of wholesalers in the meat industry were covered by the trust agreement, but plaintiffs and other retail employers began making payments into the 88 Welfare Trust in December of 1953 for the benefit of their employees who were members of Local 88 of the Meatcutters and Butcher Workmen of America, AFL, pursuant to an amendment of the trust agreement, which actually was not effective until May, 1955.
The plaintiffs in this action are three employers committed by contract to make payments to the trustees of the 88 Welfare Trust for the benefit of certain of their employees referred to above. The plaintiffs, three of the 279 contributing employers, made annual contributions to the 88 Welfare Trust amounting to in excess of $200,000.00, which is more than twenty-five percent of the total contributions. The 88 Welfare Trust is subject to the requirements of 29 U.S.C.A. § 186 (hereinafter sometimes referred to as "the Act").
The plaintiffs charge the defendants, the trustees of the 88 Welfare Trust, who will be more fully described hereinafter, with violating the provisions of 29 U.S. C.A. § 186 in a number of particulars, and question whether the 88 Welfare Trust meets the requirements of 29 U.S. C.A. § 186(c) (5) and (6). Basically, the Act forbids an employer from paying money to employee representatives, but permits the payment of money to a trust *302 fund, provided the trust fund meets certain conditions.
The plaintiffs seek herein a determination as to whether the 88 Welfare Trust meets the requirements of the Act, but in the event that it does not, do not seek the abolishment of said trust or to cause any material interruption in the primary medical benefits to which the employees are entitled under the 88 Welfare Trust, but, rather, request that the court by injunction prohibit any activities which do not meet the requirements of the Act.
The defendants are Nicholas M. Blassie, Otto Etzel, Edward J. Schnuck, Albert Wagenfuehr, Rt. Rev. Monsignor John W. Miller and James Mathews, trustees of the 88 Welfare Trust. At the time the suit was instituted Blassie and Etzel were trustees of the 88 Welfare Trust, being the representatives of the employees covered by said trust. In addition, the defendant Blassie was chairman of the board and financial secretary and treasurer of the Meatcutters and Butcher Workmen of America AFL, Local 88 (hereinafter referred to as Local 88), and was at the time and has been for many years the business agent and actual dominant leader in Local 88.
Defendant Etzel, the second trustee for the employees covered by the 88 Welfare Trust, was the recording secretary and business representative of Local 88 at the time the suit was filed.
Defendant Mathews, a first alternate trustee on behalf of the employees, was president of Local 88 when the suit was filed.
Defendant Schnuck at the time the suit was filed, and at the time of the trial, was one of the two employer trustees of the 88 Welfare Trust, and so recognized by the other trustees. Schnuck was an officer of Schnuck Giant Value Markets, Inc., one of the contributing employers to the 88 Welfare Trust.
Defendant Wagenfuehr was purportedly designated by a majority of the contributing employers as an employer trustee in July of 1960, but prior to the filing of this suit had not been recognized by trustees Blassie and Etzel as a trustee, and had not been permitted to participate as a trustee in the operation of the 88 Welfare Trust until shortly before the trial, when the situation changed, as will be hereinafter referred to.
The defendant, Rt. Rev. Monsignor Miller, at the time the suit was filed and at the time of the trial, was the designated public trustee, chairman of the board of trustees, and so recognized, having been appointed in the latter part of 1959. Monsignor Miller is director of Catholic Charities of the Archdiosese of St. Louis.
During the week before the trial commenced, the International Union removed Blassie, Etzel and Mathews as officers of Local 88 and as trustees of the 88 Welfare Trust, and placed in their stead as employee trustees Harry R. Poole and Frank X. Davis.
Immediately thereafter, a meeting of the trustees of the 88 Welfare Trust was held, and at that time, for the first time, Wagenfuehr was duly recognized by the other trustees as a trustee and permitted to act as such. During the trial the attorney for defendants Blassie, Etzel and Mathews stipulated as follows: "We would like also to make it plain that we stipulate, we concede, that the five gentlemen, including Mr. Wagenfuehr, who are now serving as a board of trustees, replacing in part Mr. Blassie, Mr. Etzel and Mr. Mathews, are a legally constituted board of trustees, and we want them to function." (Tr. 269)
The attorney further said: "We do not question in any respect the legality of the board or any party on it. As a matter of fact, we have nothing to do with it any more and we don't intend to question it in this lawsuit or elsewhere. If anyone else does, that is their business." (Tr. 272-3)
Initially, the purpose of the Trust was to "provide group insurance benefits for the participants who were eligible to receive such benefits." (Plffs' Ex. 2.) The present purposes of the trust agreement have been broadly expanded to those *303 which now appear in Article I and Article IV, Section 2(i) of the Trust Agreement (Plffs' Ex. 2.) The purposes of the Trust as set forth in Article I of the Trust Agreement, as amended (adopted in December, 1958) are to pay "* * * either from principal or income, or both, for the benefit of employees as hereinafter defined, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity, or insurance to provide any of the foregoing, or life insurance, disability and sickness insurance, or accident insurance; and to build, erect, maintain, equip, manage and operate a non-profit health and medical center or hospital, camp or other installation, as is more fully provided in Article IV, Section 2(i) * * *." (Note: The italicized above, i. e. pensions on retirement or death of employees was subsequently deleted by amendment in 1959).
Article IV, Section 2(i) states that the Board of Trustees shall use the Fund:
"To build, erect, maintain, equip, manage and operate a non-profit health and medical center, camp, hospital or other similar installation and to furnish or provide medical (including preventive) surgical, and dental care and attention and hospital services in any form for the benefit of the classes of persons named as employees and beneficiaries in Article I of the agreement and Declaration of Trust; such health and medical center, camp, hospital, or other similar installation to be operated in accordance with such plan or directions as the Trustees shall from time to time establish and Trustees shall have the full power and authority to purchase, hold and otherwise acquire and deal with property, real and personal, in connection with such health and medical center, camp, hospital, or other similar installation and to employ directors, superintendents, doctors, interns, counsellors, guards, nurses, and such subordinate employees as may be necessary for the proper conduct of such institution; and to do generally anything and everything necessary, expedient or incidental to the operation of a health and medical center, camp, hospital, or other similar installation including, but not limited to making contracts and incurring liabilities which may be appropriate to enable such health and medical center, camp, hospital, or other installation to accomplish any or all of the foregoing purposes, to borrow money for such purposes, at reasonable rates of interest, to issue notes and other obligations and to secure any of its obligations by mortgage, pledge, or deed of trust of all or any of its properties. By way of example and not by way of limitation, said program of medical care shall at the discretion of the trustees include a competently-staffed convalescent home and center, an occupational therapy workshop, erection and maintenance of dormitories and cottages where group therapy may be applied in camp surroundings, a day nursery (with dietary kitchen) for infants, stressing instruction for parents as to proper child care, erection and maintenance under the supervision of professionally qualified personnel of a swimming pool, water facilities, athletic fields and gymnastic equipment to be used in rehabilitating persons recovering from diseases and to be used in supervised physical education for employees and their dependents, classrooms and a movie projection room where classes and movies on preventive medical care can be held, * * * and everything necessary, expedient or incidental to the operation of a health and medical center, camp, hospital, or other similar institution in all its phases."
Article I further provides that "the Union and/or Board of Trustees shall be considered Employers within the scope and purview of Article I, if they choose to make contributions and otherwise to *304 bring members within this agreement and declaration of Trust. In such event * * * their employees shall be treated in every respect the same as other employers and their employees with identical and corresponding rights, obligations and duties."
The 88 Welfare Trust operation at this time may be roughly divided into three categories: (1) A group insurance program, which includes medical benefits, weekly disability benefits and life insurance; (2) a Medical Institute; and (3) a recreational area in Jefferson County, Missouri.
The insurance program is under the direct supervision of George Marklin, a trustee employee, who operates from an office located in a building owned by the Benevolent Society of Local 88. Local 88 has its offices in the same building, and also located in the building are the offices of Local 88's Benevolent Society and Credit Union, the 88 Insurance Agency, and another union.
All contributions to the Trust are paid through Marklin's office and his office pays all premiums for group insurance and routes the funds expended by other phases of the Trust.
Currently, contributions by employers amount to $35.70 per month per employee working more than twenty-three hours per week. Of this amount the group insurance premium paid by the Trust is $12.37½ per month per employee (Tr. 794).
Defendant Blassie has been the broker from whom insurance was purchased by the Trust. Through the years he has collected over $38,000.00 in commissions. As early as 1959 the propriety of the acceptance of such commissions was raised by a fellow-trustee, but Blassie continued to take such commissions (Tr. 96-7 and Plffs' Ex. 7: 10-15-59 Minutes of Trustees).
The insurance benefits to which beneficiaries are entitled are described in a booklet (Plaintiffs' Exhibit 12). As a condition precedent to participation in the insurance program each member is required to sign a subrogation agreement under which the Trust becomes subrogated to the claims of a participant against third persons from whom recovery is made of amounts paid by the Trust.
The Medical Institute, located at 4488 Forest Park Boulevard, was completed in 1958. It is staffed by medical personnel, headed by a chief of staff, the staff including physicians and surgeons in various specialized categories, all of whom are on a salary basis with the Trust (Tr. 763-64; Plffs' Exhibit 48, p. 6).
The facilities of the Medical Institute include a pharmacy where beneficiaries may purchase drugs at reduced prices. This facility has been made available to members of other unions, who have no connection with the Trust.
The Trust owns some 586 acres of land in Jefferson County, Missouri, which was acquired late in 1958 from a corporation owned and controlled by defendants Blassie and Etzel. Details of the acquisition of this land are reflected in the Minutes of the Trustees (Plffs' Ex. 6: Minutes of Trustees: 4-17-58, 5-15-58, 6-19-58, 7-17-58, 8-21-58, 9-18-58, 10-16-58 and 11-29-58), and in the testimony of Blassie and Etzel and other witnesses.
When the area was first acquired it was called "Local 88 Recreational, Educational and Convalescent Area." It presently carries the name of "Local 88 Retreat for Convalescing and Geriatrics" (Tr. 208 and Plffs' Ex. 7: 121-60 Minutes of Trustees).
The plaintiffs raise a number of questions, in that they challenge benefits afforded persons who have lost their status as employees of contributing employers, benefits afforded to employees of Local 88 and of the 88 Welfare Trust, the acquisition and intended use of the land in Jefferson County, Missouri, and a number of acts which pertain to the day-by-day administration of the 88 Welfare Trust. Before discussing some of these matters in detail, and others by general reference, one must turn to the law under which the *305 88 Welfare Trust must operate to be a legal trust. In order to understand the conditions under which the 88 Welfare Trust must operate, we must first turn to the statute itself.
29 U.S.C.A. § 186 is divided into several subsections and provides, in part, as follows:
"(a) It shall be unlawful for any employer or association of employers * * * to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value
"(1) to any representative of any of his employees who are employed in an industry affecting commerce; or
"(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce * * *."
Subsection (b) is the counterpart of subsection (a), and provides: "It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) * *."
Subsection (c) provides that the prohibitions of subsections (a) and (b) shall not be applicable with respect to certain enumerated payments which, for the purposes of this litigation, are covered in subsection (c) (5) (A), (B) and (C), and subsection (c) (6). (Note: Subsection (c) (6) amended 29 U.S.C.A. § 186, in 1959.)
Subsection (c) (5) provides that the prohibitions of subsections (a) and (b) shall not be applicable "with respect to money or other thing of value paid to a trust fund established by such representative for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents)", provided certain conditions are met:
First: A trust must be established to hold the payments.
Second: The payments must be for the sole and exclusive benefit of the employees of the employer making the payments and families or dependents (or of such employees, families and dependents jointly with the employees of other employers making similar payments, and their families and dependents).
Third: The trust must provide for payment out of principal or income, or both, for: (1) Medical or hospital care; (2) pensions on retirement or death of employees; (3) compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing; or (4) unemployment benefits or life insurance; (5) disability and sickness insurance; or (6) accident insurance; (7) pooled vacation, holiday, severance or similar benefits, or defraying costs of apprenticeship or other training programs. [(7) was added in 1959 by 29 U.S.C.A. § 186(c) (6).]
Subsection (c) (5) (B) prescribes further rules governing the allowed trusts:
1) The detailed basis of the payments by the employer must be specified in a written agreement with the employer.
2) The employees and the employers must be equally represented in the administration of the trust fund.
3) There may be provision for a neutral person to act as a trustee in the administration of the fund; or, in the absence of any provision for such a neutral person, selection to be made of such neutral person in the case of a deadlock, with recourse to the District Court if no agreement can be reached on the appointment of a neutral person.
4) There must be provision for an annual audit of the trust fund, and the statement of the results of that audit must be made available to interested persons at the principal office of the trust fund and at such other places as may be provided in the trust fund agreement.
*306 With relation to pensions or annuities, it is provided, in subsection (c) (5) (C), that payments made for the purpose of providing pensions or annuities must be made to a separate trust.
29 U.S.C.A. § 186(d) provides that any person who willfully violates any of the provisions of Section 186 shall, upon conviction thereof, be guilty of a misdemeanor and subject to fine of not more than $10,000.00, or imprisonment for not more than one year, or both.
29 U.S.C.A. § 186(e) provides that the District Court shall have jurisdiction to restrain violations of Section 186. This court is vested with jurisdiction in this cause by virtue of subsection (e), in that plaintiffs seek to restrain violation of 29 U.S.C.A. § 186, and to obtain such other relief as shall be proper under the proof.
There have been a number of district and appellate court decisions dealing with 29 U.S.C.A. § 186, based upon various sets of facts, but said decisions for the most part are of little help to the court in deciding the questions presented in this case, other than as to the question of day-by-day administration. The Supreme Court in Arroyo v. United States, 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915, dealt with a problem concerning the Act and laid down what to this court seems to be very clear and controlling standards by which welfare trusts subject to this Act are controlled. The court in that case, 359 U.S. l. c. 426, 79 S.Ct. at pages 868-869, 3 L.Ed.2d 915, had this to say:
"Congress believed that if welfare funds were established which did not define with specificity the benefits payable thereunder, a substantial danger existed that such funds might be employed to perpetuate control of union officers, for political purposes, or even for personal gain. * * * To remove these dangers, specific standards were established to assure that welfare funds would be established only for purposes which Congress considered proper and expended only for the purposes for which they were established. * * * Continuing compliance with these standards in the administration of welfare funds was made explicitly enforceable in federal district courts by civil proceedings under § 302(e). The legislative history is devoid of any suggestion that defalcating trustees were to be held accountable under federal law, except by way of the injunctive remedy provided in that subsection." (Section 302 is 29 U.S.C.A. § 186.)
Before turning to the specific problems with which the court is confronted in this case, it is worth noting that while the trust provides it shall be governed by five trustees (two representing the employees, two representing the employers, and one public trustee), the activities of this trust, since its inception, has been dominated by and subject to the whims of one trustee  Blassie. He has dominated every aspect of it and its activities have been the result of his desires, an examination of which would indicate little regard for the real purpose of the 88 Welfare Trust, but rather, to foster in every aspect the welfare of Local 88 and his personal aggrandizements, and with almost seemingly utter contempt for the law.
Under the original Trust Agreement the only beneficiaries (called participants) of the trust were union member employees of the contributing employers (Plffs' Ex. 2, p. 2). The purpose of the trust was to provide group insurance benefits for such participants.
Retired persons became beneficiaries of the trust by an amendment passed at a trustees' meeting on March 28, 1957. The amendment was adopted to include as beneficiaries: "* * * and members of Local 88 * * * who were insured under this agreement, but who have retired and whose annual earnings do not exceed $1,200.00 per year." (Tr. p. 75; Plffs' Ex. 6: 3/28/57 Minutes of Trustees; Plffs' Ex. 2, pp. 36-38.)
This original program was put into operation on June 1, 1957, with seventy-four members participating. The program was self-insured, with the retired *307 members and the 88 Welfare Trust sharing the cost. In October, 1961, the monthly contribution of each retired member was raised from five to ten dollars because of the rising cost of the program (Plffs' Ex. 48). Both of these figures are well below the amount contributed by contributing employers for the benefit of participating employees.
The provision, adopted on March 28, 1957, establishing retired persons as beneficiaries was deleted by amendment on August 21, 1958 (Plffs' Ex. 2, p. 45). The trustees subsequently reinstated retired persons as proper participants or beneficiaries of the welfare trust. On January 15, 1959, the trustees purportedly adopted "Regulation No. 4", which purported to permit retired union members who maintained their union membership to use the facilities of the Medical Institute after retirement, upon payment by them of such amounts as should be specified by the trustees. "Regulation No. 4" is not mentioned in the minutes of the trustees' meeting of January 15, 1959; however, on May 11, 1960, the trustees amended "Regulation No. 4", eliminating Union membership as a prerequisite to participation in the program for retired persons, referred to as the "Senior Membership" program (Plffs' Ex. 7, 5/11/60 Minutes of Trustees' meeting). It should be noted that at the present time "Senior members" are eligible for the same Medical Institute benefits accorded other full benefit members as well as Local 88 Retreat benefits (Tr. 80), plus the group insurance benefits (See Plffs' Ex. 48).
At the beginning of the "Senior Members" program, membership was available to all retired meatcutters, regardless of whether they had ever been covered by the trust, and others. Now, there are fixed standards of eligibility, including the requirement that the member must have been covered by 88 Welfare Trust (that is, his employer must have made monthly contributions for him) from the inception of the program. Although this objective test is one of the rules governing the Senior Members' Program, it is not followed, as the evidence shows that as of May 31, 1963, there were one hundred one persons covered under the program, of which eight had never been covered by the trust program prior to retiring (Plffs' Ex. 48, pp. 10, 11).
It should also be noted that although the trustees, on May 11, 1960, eliminated union membership as a prerequisite to participation in the Senior Members' Program, Marklin testified that union membership is necessary for participation.
The plaintiffs contend that it is illegal under subsection (c) (5) of the Act to provide the benefits of the 88 Welfare Trust to retired persons, since they have lost their "employee" status. The defendants contend that the Act permits certain benefits to be set up for retired persons. An examination of the Act discloses defendants' contention to be true, in that it provides in substance that trusts may be established for the payment of pensions on retirement or death of employees, but the Act (29 U.S.C.A. § 186(c) (5) (C) further provides that payments made for the purpose of providing pensions on annuities must be made to a separate trust, which is separate from a welfare trust, and in this instance (88 Welfare Trust) we are dealing with a welfare trust. In other words, the Act specifically provides for the establishment of two types of trusts, one for the benefit of employees, the other for the benefit of retired employees. Congress did not intend welfare trusts to include pensions or annuities as benefits of such trusts. As stated in the Arroyo case, supra, Congress established specific standards with respect to welfare trusts. As stated in the Act, a welfare trust is established "for the sole and exclusive benefit of the employees (emphasis added) of such employer, and their familities and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): * * *."
Retired personnel are not employees of the contributing employers and cannot legally *308 be included as beneficiaries under the 88 Welfare Trust. What has occurred with respect to this activity of the trust clearly indicates the desires of Blassie, in that not only has 88 Welfare Trust included persons who before retirement were beneficiaries of the 88 Welfare Trust, but has been expanded to include union members who were never beneficiaries of the 88 Welfare Trust before retirement. Also, in a further effort to promote the union activities, provisions of 88 Welfare Trust have required that all retired members who were permitted to participate in the benefits of the trust must be union members (subsequently deleted but still required), and further must be personally passed upon by Blassie, who would determine personally whether or not they would be permitted to share in the benefits of the trust.
The plaintiffs have challenged the inclusion of the employees of the 88 Welfare Trust as beneficiaries under the trust. Turning to this problem, the testimony discloses that in December, 1957, a regulation was adopted to permit the trust itself to be considered an "employer". The regulation was passed at a meeting where only three trustees were present. The employees of the trust were thereafter accorded the privilege of becoming beneficiaries under the trust (Tr. 83, 84; Plffs' Ex. 6: 12/9/57 minutes).
In December, 1958, a complete rewrite of the trust agreement was prepared by Harlin Heath, an employee of the trust. It was intended that such rewrite was to include no new matter, but was to include only all amendments passed in earlier meetings (and names of new trustees). However, the provisions of the regulation adopted in 1957, relating to the trust as an employer, was incorporated in the rewrite (Plffs' Ex. 16: 12/18/58 Minutes of trustees, Plffs' Ex. 2, p. 54).
Although Heath testified that he intended to include only amendments in the composite trust agreement (of 1958), it is clear that the regulation was included as a part of the trust agreement.
By bookkeeping transfers within the trust, the trust made payments to itself for those employees of the trust who became union members of Local 88 (a prerequisite), and such employees were thereafter considered beneficiaries. These employees of the trust who became beneficiaries became entitled to benefits on the same basis and subject to the same limitations as the active employees of contributing employers.
Defendants contend that there is little reason to be concerned about participation in the programs of the trust, as beneficiaries, by employees of the trust. Defendants argue that no bribery, extortion or abuse of power is likely to result because of such participation. Further, defendants contend that such participation is simply part of the compensation of trust employees and nothing in 29 U.S. C.A. § 186 states or implies that trust funds may not be used for this purpose.
Possibly, defendants are correct in assuming that no bribery, extortion or abuse of power is likely to result because of such participation. However, it is not the function of this court to make such determination, as was made quite clear by the United States Supreme Court in Arroyo v. United States, 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959). Clearly, if Congress had thought employees of such trustees should be included they could have done so. They did not, however.
Further reasons compel the court to hold that the employees of the 88 Welfare Trust in particular should not participate in the 88 Welfare Trust's benefits. In the case at bar, there are no payments or contributions made on behalf of the employees of the 88 Welfare Trust except by the trust itself. 29 U.S.C.A. § 186(c) (5) clearly provides that the trust fund must be for the sole purpose of employees of contributing employers. This requirement cannot be satisfied simply by bookkeeping transfers within the trust itself. The requirement was obviously put into the Act so that employees of contributing employers would be protected. *309 If the requirement was absent, dishonest trustees could easily make payments to employees of the trust who actually were not full time employees, etc., of the trust. This could give power and control to union leaders who were also trustees.
Plaintiffs challenge the validity of the inclusion of officers and employees of the union as beneficiaries of the 88 Welfare Trust. From the very inception of the Local 88 Welfare Trust the officers of the union have been included as beneficiaries, with payments made on their behalf by the Union (Tr. 55). The original trust agreement contained no provision for their inclusion.
In December, 1957, a "regulation" was adopted that permitted the Union to be considered an employer so that employees of the union could thereafter be considered beneficiaries under the trust (Tr. 83, 84; Plffs' Ex. 6: 12/9/57). (See the facts discussed, supra, under the section concerning employees of the trust.)
The plaintiffs contend that officers and employees of Local 88 cannot be regarded as employees and, therefore, cannot be validly considered beneficiaries of the 88 Welfare Trust under 29 U.S.C.A. § 186 (c) (5).
Defendants contend that since a union can be an employer, then its employees can rightfully receive benefits of the trust if Local 88 (acting as an employer) makes similar payments (compared with plaintiffs' payments) into the trust fund.
29 U.S.C.A. § 186(c) (5) states that employees of contributing employers may be made beneficiaries "jointly with the employees of other employers making similar payments." Defendants contend that the union made like contributions just as any other employer.
29 U.S.C.A. § 152(2) provides that "[t]he term `employer' * * * shall not include * * * any labor organization (other than when acting as an employer) * * *." The statutory definition indicates that a labor organization in its capacity as an employer is an "employer" within the meaning of the statute. 29 U.S.C.A. § 152(a) is applicable to 29 U.S.C.A. § 186 via 29 U.S.C.A. § 142(3). See Office Employees International Union Local No. 11, A.F.L.-C.I.O. v. N. L. R. B., 353 U.S. 313, 77 S.Ct. 799, 1 L.Ed.2d 846 (1957), where the Supreme Court held that when a labor union takes on the role of an employer, the statute applies to its operations just as it would any employer. The court decided that the teamsters union was an employer of office-clerical workers employed in the Teamsters Building. The court was interpreting 29 U.S.C.A. § 152(2) at the time.
Defendants contend that because "employers" includes labor organizations, that 29 U.S.C.A. § 186(c) (5) allows officers and employees of the union to be included as beneficiaries of the trust. Defendants also point out that "[t]he term `employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless the Act explicitly states otherwise * * *." 29 U.S.C.A. § 152(3) applied to 29 U.S.C.A. § 186 via 29 U.S.C.A. § 142(3).
The court is of the opinion that the United States Supreme Court in Office Employees International Union, Local No. 11, A.F.L.-C.I.O. v. N. L. R. B., supra, did not hold that a union could be considered an "employer" as related to "officers" of the union The facts of the case and the court's holding clearly show that the court considered a union an "employer" of clerks, secretaries, and the like, and did not hold that a union was an employer of its officers. If officers were considered employees of the union, and if such officers would organize among themselves and bargain with their employer-union, a situation would exist where such officers would be bargaining with themselves. Such a situation would be untenable.
Although it is well established that a union can be an employer, the court holds that a union cannot be an employer under the terms of 29 U.S.C.A. § 186(c) (5) as applied to the 88 Welfare Trust. To hold *310 otherwise would be to defeat the primary purpose of 29 U.S.C.A. § 186. One of the primary purposes of the Act was to alleviate the substantial danger that welfare funds might be employed to perpetuate control of union officers. Arroyo v. United States, supra. To allow Local 88 to be an employer under the 88 Welfare Trust would be to give union leaders an opportunity to funnel welfare benefits to union employees at the union leaders' discretion.
To hold that a union was an employer for the purposes of this trust would be to say that the union would have the right to participate in the selection of employer trustees. This would be contra to 29 U.S.C.A. § 186(c) (5) (B), which requires that "employees and employers are equally represented in the administration of such fund * * *."
In this connection, it might well be that the challenge by Blassie and Etzel of Wagenfuehr as a trustee was in their capacity as representatives of an employer (Local 88), although the court is of the opinion they opposed Wagenfuehr because he would not be subjected to economic pressure by Blassie in union dealings since he employed no meatcutters.
Another question for the court is that pertaining to the 586 acres of land owned by the 88 Welfare Trust in Jefferson County, Missouri, which was acquired in 1958 from a corporation owned and controlled by defendants Blassie and Etzel. The details on the acquisition of this land as reflected in the minutes of the trustees' meeting and the testimony of various witnesses are not clear, but this is a matter with which we are not concerned at this point. When the area was first acquired it was called "Local 88 Recreational, Educational and Convalescent Area." At the time of the trial it was called "Local 88 Retreat for Convalescence and Geriatrics."
The testimony clearly shows that at the time this property was acquired, it was so acquired as a purportedly joint venture on behalf of the 88 Welfare Trust and Local 88. A reading of the Act clearly discloses that no joint venture under any circumstances could ever be legal. All the money for purchase and development of the area has been provided for from trust funds and the union disappeared from the project in the early stages.
The testimony discloses that it was called to the attention of the trustees that this was probably an illegal venture on the part of the 88 Welfare Trust, and it was suggested that a lawsuit be brought to determine whether or not the 88 Welfare Trust could hold the property for the purposes for which it was acquired and the use to which it was to be put. Such a lawsuit was filed in the Circuit Court of Jefferson County, Missouri. The lawsuit was dismissed when it was determined that this was a matter that could only be passed on by the federal courts, and the lawsuit was not refiled in the federal court.
There can be no question under the record but what the area was acquired for recreational purposes and it has never been used in any respect for any other purpose. Thousands of dollars have been spent under the supervision of Blassie and Mathews in the development of the area for recreational purposes. The use of the area which has been made has been limited to the good weather months, with little or no use during the winter. The area has been used by persons and groups who have no connection with the 88 Welfare Trust, such as Local 88, the St. Louis Food Council, Boy Scouts, Cedar Hill Fire Department, a speech defect group, church groups, and others. Members of Local 88 are permitted to take guests to the recreational area without limitation, either as to the number of guests or as to whether or not the union member is a beneficiary under the trust.
The defendants Blassie, Etzel and Mathews contend that the use of the property was never intended to be limited to recreation; that the recreational program was only secondary to the medical *311 and health master plan. These defendants further argue that the reason the facilities for medical and health programs have not been established is due to lack of funds, but the testimony discloses without question that the entire development of the property to this point has been for recreation alone; that trust money has been spent in having elaborate plans prepared with respect to the use of the property, which plans have dealt almost entirely with recreation. One of such plans referred to as a "master plan" (Plffs' Ex. 5) was prepared by the Layton firm; another study was made by one James Heath; and both of these dealt with recreation, covering many phases of recreation, ranging from spots designated on which to play mumble-peg, to other areas set aside for the location of a ski lift.
On cross-examination, Blassie, the mastermind of this area, stated that all types of recreation were intended to be provided, and that if anything concerning recreation had been forgotten, "We want to include that too" (Tr. 528). He was quite proud of the barbecue pit, purportedly the world's largest, which he had had built for the trust on the grounds. In passing, however, Blassie did indicate that it would not include a golf course as he did not play golf. During the trial it was interesting to note that after Blassie had expounded so voluminously on the recreational aspects to which the area would be put, a recess was taken, and that immediately after the recess his testimony was changed to some extent to indicate that recreation was only a secondary purpose of the area, and that the primary purpose was one of providing an area which would benefit the health of the beneficiaries of the 88 Welfare Trust.
The Act prior to 1959 clearly did not allow trust fund moneys to be used for recreational purposes. In 1959, the Landrum-Griffin amendments to the Act included among the benefits authorized the following: Pooled vacation, holiday, severance or similar benefits, or defraying costs of apprenticeship or other training programs. The court holds that even under the Landrum-Griffin amendments to the Act trust fund moneys may not be used for recreational purposes. Clearly, the past and present use of this area has been for recreational purposes alone. Several hundred thousand dollars, which should have been spent to provide medical benefits in the form of medical care or insurance for the participating employees under this 88 Welfare Trust, have been misused. Had it been properly used, there is no reason why substantially more insurance and other benefits should not have been accorded to these participating employees. In a trust such as the 88 Welfare Trust, which does not deal with pensions, there is no valid reason to have more than a normal amount of cash for emergencies in reserve. The rest should be used to secure benefits for which the trust was set up, as authorized by the Act.
The acquisition of the land in Jefferson County was in violation of the Act, and the money which has been spent on it and with respect to it, equally so. The Supreme Court in the Arroyo case, supra, clearly set out that Congress was concerned with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control. No better example can be given of such abuse than the acquisition of this land for this purpose, clearly in the face of the statute.
It was contended that this property would eventually be used as a part of a medical and health master plan, primarily for the benefit of convalescent employees covered by the 88 Welfare Trust, and retired personnel. Blassie testified that if he had not had to be present to testify in the case that he would have been with a group in Sweden who were exploring how programs are set up for retired personnel, such housing to be on property near this area, and the area developed for the use of retired personnel who would live nearby, which of course, would mean *312 primarily a recreational development, and in addition perhaps the establishment of a small sausage factory to help supplement the income of retired personnel. As the court reads the Act and follows the guide laid down in the Arroyo case, it is the court's opinion that under the past and present use of the property it is in violation of the Act, and even the purported use of the property for convalescing and retired personnel's use is in violation of the Act. The court would not want to leave the impression in holding that the 88 Welfare Trust cannot carry on this activity that the court is limiting it to recreation alone, as this opinion has previously dealt at length with respect to retired personnel.
The testimony discloses, as previously mentioned, that at the Medical Institute, one of the facilities of the 88 Welfare Trust, is a pharmacy which is operated so that beneficiaries of the trust may purchase drugs at reduced prices. In the operation of the pharmacy its use has been made available to members of Local 88 and other unions who have no connection whatever with and are not covered by the trust agreement. As previously stated, the 88 Welfare Trust is for the benefit of employees, their families and dependents, in whose behalf contributing employers have made payments for such purpose, and such purpose alone, and the operation of a pharmacy for the benefit of others is in violation of the statute.
The testimony, as previously indicated, discloses that Marklin's office is located in a building owned by the Benevolent Society of Local 88, and that in the same building, Local 88, Local 88's Benevolent Society and Credit Union, the 88 Insurance Agency, and another union, are located. In the spirit in which the Act was written, as set out in the Arroyo case, supra, the trustees will seek other convenient quarters away from the building wherein Local 88 and various facets of the union are located. A similar order was entered by the court in American Bakeries Company v. Barrick, D.C., 162 F.Supp. 882, 885.
Initially, the question was raised as to whether there was equal representation of employers and employees in the 88 Welfare Trust. A provision in the trust agreement had been made for alternate trustees for the trustees representing the employees, but there was no provision for alternate trustees for trustees representing the employers. This question is moot at this time because during the trial the provisions for alternate trustees for employee trustees were eliminated. Defendant Miller's Exhibit 3 contains an amendment to that effect, being the minutes of the trustees' meeting on May 27, 1963. In the same amendment the trustees eliminated the requirement that the removal of employer trustees could only be for substantial cause. While these matters are moot at this time, the court is of the opinion that such amendments are proper, and had the amendments not been passed the court would have required that the same standards with respect to alternate trustees must apply to both sets of trustees, as the Act provides that the representation of employers and employees with respect to the operation of the trust shall be equal. The court would have also required the removal provision regarding employer trustees be deleted.
The plaintiffs challenge various acts as to which there was considerable testimony concerning the day-to-day administration of the trust funds. Plaintiffs, to support such allegations and the testimony with respect thereto, contend that this court has authority to exercise more general equity powers over welfare funds than just the mere authority to forbid the payments into welfare funds, in violation of 29 U.S.C.A. § 186. A number of cases have been cited by plaintiffs to support such broad jurisdictional power. Upholsterers' International Union of North America v. Leathercraft Furniture, D.C., 82 F.Supp. 570; Copra v. Suro, 1 Cir., 236 F.2d 107; In re Bricklayers' Local No. 1, etc., D.C., 159 F.Supp. *313 37; American Bakeries Company v. Barrick, D.C., 162 F.Supp. 882.
On the other hand, a number of cases reject the claim that the statute vests the federal courts with broad equity jurisdiction of welfare funds. Moses v. Ammond, D.C., 162 F.Supp. 886; Employing Plasterers' Ass'n of Chicago v. Journeymen Plasterers' Protective and Benev. Soc. of Chicago, Local No. 5, 7 Cir., 279 F.2d 92; American Bakeries Company v. Barrick, D.C., 162 F.Supp. 882; Sanders v. Birthright, D.C., 172 F.Supp. 895. It will immediately be noted that the American Bakeries Company case, supra, has been cited as supporting both sides of this matter, and as the court reads the case it may be so interpreted.
The court is of the opinion that while plausible arguments may be advanced for both sides of the question, the court is persuaded that the better reasoning is set forth in the Employing Plasterers' Ass'n case, supra, a Seventh Circuit decision, wherein the court discusses the matter at some length, and in dicta 279 F.2d at page 97 indicates that the Seventh Circuit is of the opinion that the "Act does not create jurisdiction * * to entertain * * * claims based solely on the alleged diversion or conversion of * * * welfare funds."
This reasoning in the court's opinion is in line with what the Supreme Court had to say in the Arroyo case, supra, 359 U.S. l. c. 427, 79 S.Ct. at page 869, 3 L.Ed. 2d 915: "The legislative history is devoid of any suggestion that defalcating trustees were to be held accountable under federal law, except by way of the injunctive remedy provided in that subsection."
It would seem to this court that the Supreme Court clearly indicates that while activities in the day-to-day administration of the trust may be subject to control by the courts, that it is the state courts, who from day to day deal with the administration of trust funds, in trusts of all kind, description and character, who must deal with those activities in trusts of this type. It is this court's opinion that 29 U.S.C.A. § 186 is aimed primarily at the prevention of possible abuse and not at providing a remedy for abuse actually perpetrated in the operation of the trust. The Act grants jurisdiction to district courts to enjoin violation of 29 U.S.C.A. § 186(a) and (b). Nothing is mentioned about giving federal courts jurisdiction over welfare trusts and trustees except where violations of the Act occur. If the conduct is legal under the Act, then this court has no jurisdiction, but rather, jurisdiction is that of the state court.
The plaintiffs brief contends that defendants Blassie and Mathews should be enjoined permanently from acting as trustees of the 88 Welfare Trust. It should be noted that the plaintiffs' complaint does not specifically ask for any such relief. It should further be noted that at the time of the trial the question of the removal of Blassie and Mathews, and for that matter, Etzel, was moot, because as previously indicated, these men were removed as trustees shortly before the trial commenced by the International, and as previously indicated, their attorney stipulated that at the time of the trial they did not question the legality of the board or any part of it. The plaintiffs challenge, and testimony was produced regarding a number of instances of conduct with respect to the activity of the trustees in the performance of their fiduciary duties. Abundant evidence exists with respect to some of these matters, such as Blassie's interference with the selection of employer trustees, his position that employer trustees should not be appointed unless they were acceptable to the union, his participation in the purchase of property for the 88 Welfare Trust owned by himself and Etzel, his acting as broker for the insurance and the receiving of commissions over the years for the sale of insurance to the 88 Welfare Trust, the making of a movie regarding the trust primarily for the union's benefit, and other activities which the court shall not *314 enumerate. The reason is, that, as previously stated, the court is of the opinion that the federal district courts do not have jurisdiction to review the administration of a welfare trust except where violation of the Act occurs, because such matters are not violations of the Act, but fall within the activities of the day-today administration of the trust. In view of this finding by the court, it would serve no useful purpose for this court to discuss the matters pertaining to administration of the trust, for those are matters for a state court's consideration.
The court accordingly finds that the trustees of the 88 Welfare Trust who were defendants at the time the case was instituted and tried, those trustees who were substituted for Blassie and Etzel, and any successor trustees, are enjoined from expending trust funds for the benefit of retired employees of the contributing employers to the 88 Welfare Trust, retired employees who were not formerly beneficiaries under the trust, employees of the 88 Welfare Trust, and officers and employees of Local 88.
They are further enjoined from expending money toward the proposed facilities to be erected on the land in Jefferson County, Missouri, except for normal upkeep, until within a reasonable time said land must be disposed of.
They are further enjoined from the operation of a pharmacy at the Medical Institute except for the benefit of the legal participants of the 88 Welfare Trust.
They are further directed to remove the office occupied by George Marklin from its present location and to secure quarters for Marklin's office in a location completely removed from any union activities.
This memorandum opinion is adopted by the court as its findings of fact and conclusions of law, and the attorneys for the plaintiffs are directed to prepare the proper judgment and submit to the court for entry.