Joseph W. HALEY and Henry Whitney, as Trustees of the International Association of Bridge, Structural and Ornamental Iron Workers Local 417, Training and Education Fund, Plaintiffs,

v.

Robert PLATNICK, Trustee of the International Association of Bridge, Structural and Ornamental Iron Workers Local 417, Training and Education Fund, et al., Defendants.

No. 74 Civ. 284–LFM.

United States District Court,
S. D. New York.

June 13, 1974.

John R. Harold, New York City, for plaintiffs.

Granik, Garson, Silverman & Nowicki, New City, N.Y., for defendant Willis C. Rose; David W. Silverman, New City, N.Y., of counsel.

Guazzo, Silagi & Craner, P. C., New York City, for defendant Robert Palatnik; Mitchel B. Craner, New York City, of counsel.

John Donoghue, New York City, for defendant Joseph Albenda.

## OPINION

MacMAHON, District Judge.

Plaintiffs, trustees of the Training and Education Fund (Fund) of the International Association of Bridge, Structural and Ornamental Iron Workers, Local 417 (Union), seek a declaratory judgment, under 28 U.S.C. § 2201, declaring void a contract of employment between the Fund and defendant Rose,[1] as Fund administrator. Plaintiffs also seek injunctive relief restraining defendants "from effectuating such contract of employment or making any payment thereunder." Jurisdiction is based upon the general federal question provi-

sions of 28 U.S.C. § 1331(a) and § 302(e) of the Labor Management Relations Act of 1947,[2] as amended, 29 U.S.C. § 186(e).

This case came before us on our motion calendar and was immediately accelerated for trial on the merits. Evidence was presented by the parties on two trial days, beginning March 8 and ending March 11, 1974.

The Fund is an apprentice training and education trust fund, created pursuant to § 302(c)(6) of the Act, 29 U.S.C. § 186(c)(6). Since 1967, under collective bargaining agreements negotiated by the Union with various employer associations and individual employers, contributions have been made to the Fund by the employers, based upon the number of hours they employ members of the Union.

On May 29, 1973, defendant Rose, who at that time was a Fund trustee and president of the Union, entered into an agreement with the Fund under which Rose was retained as the Fund's full-time administrator for five years.

Plaintiffs claim that Rose's contract of employment with the Fund violates § 302(a) and (b) of the Act because (1) Rose caused himself to be hired as Fund administrator, in violation of his fiduciary duty as trustee to the Fund's beneficiaries, (2) the contract was not approved in accordance with the provisions of the trust instrument establishing the trust, and (3) the payments made to Rose under the contract represent illegal payments of money by an employer to a representative of its employees.

The Act makes it unlawful for an employer or an association of employers to make payments to a union or other representative of its employees and for the representative to receive such payments under § 302(a) and (b), 29 U.S.C. § 186(a) and (b).[3] Subsection (c)(6) of

---

1. Rose has been joined as a defendant individually and as a former trustee of the Fund.

2. Commonly known as the Taft-Hartley Act.

3. 29 U.S.C. § 186(a) and (b) provide:
   "(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in

§ 302 exempts from this prohibition payments made "to a trust fund established by such representative for the purpose of . . . defraying costs of apprenticeship or other training programs,"[4] if the Fund complies with certain statutory requirements. These requirements are as follows: (1) the basis upon which the employer will make payments to the Fund must be set forth in detail in a written agreement with the employer, (2) the employer and employees must be equally represented among the persons administering the Fund and the agreement must contain provisions to remedy any deadlocks among the trustees, (3) the written agreement must provide for an annual audit of the trust fund, and (4) the statement of the annual audit must be made available for inspection by interested persons at the principal office of the trust fund and at such other places as designated by the agreement.

The Fund was established as an employer-supported Fund in 1967, after execution of the collective bargaining agreements detailing the basis for employer contributions. There is no question that the Fund was established in accordance with the provisions of the Act. The Union and employers are each represented by two of the four Fund trustees. Currently, the employer contribution to the Fund is four cents (4¢) per hour worked.[5]

Rose was, until July 1, 1973, the elected president of the Union, an office he had held since 1963. He also held the following appointive positions: assistant business agent, chairman of the Joint Apprenticeship Committee and trustee of the Training and Education Fund, Annuity Fund and Welfare and Pension Fund. In May 1973, Rose was removed as assistant business agent by vote of the Union's membership. Subsequently, at the June 30, 1973 membership meeting, Rose was defeated by plaintiff Haley in the election for Union president. Rose was not reappointed as trustee for any of the trust funds.

Plaintiffs claim that Rose, a bitter loser of a Union leadership fight, abused his position as president of the Union and trustee of the Fund to induce the other Fund trustees to consent to his being hired as Fund administrator at an exorbitant salary. The employer trustee defendants are alleged to have conspired with Rose to retain him as Fund administrator in order to benefit the faction in the Union power struggle they considered most favorable to management. This conduct violates the statute, plaintiffs contend, because it breaches the fiduciary duty of Rose and the other

---

the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

    (1) to any representative of any of his employees who are employed in an industry affecting commerce; or

    (2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

    (3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

    (4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

    (b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section."

4. 29 U.S.C. § 186(c)(6).

5. In the last collective bargaining agreement negotiated between the Union and the employers, the employer payment was reduced from 8¢ to 4¢ per hour. The remaining 4¢ was applied to the employees' wages because it was felt that the Fund had sufficient funds to carry it for several years.

trustees to the Fund beneficiaries [6] and is a scheme to divert trust funds to Rose, in violation of the Act which prohibits payments by an employer to an employee representative. Therefore, they argue, the contract is void as contrary to the language and policy of the statute. In addition, plaintiffs claim the contract is void because it was not approved by the trustees in accordance with the provisions of the trust instrument.

■ The complaint alleges no claim for relief under state law. Plaintiffs could have pleaded state claims for breach of fiduciary duty and failure to comply with the trust instrument, and we could have, in our discretion, exercised jurisdiction over those claims as pendent to plaintiffs' federal claim under the Act.[7] In fact, this would have been the better practice from the standpoint of efficiency and policy, because we would then be able to settle all the claims between the parties and determine questions of state law which are closely tied to the federal labor policy of Taft-Hartley.[8] Unfortunately, plaintiffs have not seen fit to join any of their state claims in this action or to amend their complaint to do so, and, therefore, we must determine whether their claims can properly be brought under § 302 of the Act.

■ We note, at the outset, that we have subject matter jurisdiction because § 302(e) grants jurisdiction to the federal district courts to enjoin violations of § 302. And since 28 U.S.C. § 2201 confers upon a federal court "in a case of actual controversy within its jurisdiction" the power to "declare the rights and other legal relations of any interested party seeking such a declaration," plaintiffs will be entitled to a declaratory judgment and injunctive relief should they prove that defendants have violated the Act.[9] We have grave doubts, however, that the prohibitions of the Act extend to breaches of fiduciary duty by Fund trustees or to payments to Fund administrators which are not approved in accordance with the trust instrument. Claims of this nature are normally cognizable under state law and cannot properly be brought under § 302 and are, therefore, outside the scope of plaintiffs' complaint and our jurisdiction over this action.

In enacting § 302 of the Labor Management Relations Act of 1947, congress attempted to prevent corruption of the collective bargaining process by insulating it from bribery by employers or extortion by union representatives. Congress was also concerned with possible abuse of trust funds if left solely under the control of union officials.[10] It was feared, for example, that the welfare fund of the United Mine Workers of America might "become merely a war chest for the particular union. . . . "[11] Congress sought to solve these problems by prohibiting all employer payments to trust funds unless they were jointly administered by union and employer trustees.

The original purpose of the Act is echoed in the House Report on the 1969 Amendments to § 302, which permitted employer-supported trust funds to be es-

---

**6.** There can be no doubt that the trustees of the Fund owe a fiduciary duty to the Fund beneficiaries. Lee v. Nesbitt, 453 F.2d 1309, 1311 (9th Cir. 1972).

**7.** Snider v. All State Adm'rs, Inc., 481 F.2d 387, 391–392 (5th Cir. 1973).

**8.** Snider v. All State Adm'rs, Inc., *supra*, 481 F.2d at 391–392.

**9.** 28 U.S.C. § 2201; Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950).

**10.** Arroyo v. United States, 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959); 2 Legislative History of the Labor Management Relations Act 1305 (1947).

The section was added to the bill as an amendment in the Senate and was accepted by the Conference Committee. See, Arroyo v. United States, *supra*, 359 U.S. at 425 n. 6, 79 S.Ct. 864.

**11.** 2 Legislative History of the Labor Management Relations Act 1309; Lewis v. Seanor Coal Co., 382 F.2d 437, 442 (3d Cir. 1967).

tablished for scholarships and child care centers:

"Section 302 of the Labor-Management Relations Act prohibits payments by employers of money or other thing of value to employee representatives. This broad prohibition was enacted to prevent bribery, extortion, shakedowns, and other corrupt practices, and to protect the beneficiaries of lawful employer-supported funds."[12]

Seizing upon the obvious congressional intention to protect the beneficiaries of trust funds, many plaintiffs have argued, sometimes with success,[13] that congress, in enacting § 302, meant to confer upon the federal judiciary jurisdiction over the day-to-day administration of trust funds. Such plaintiffs have analogized § 302 to § 301(a) of the Act, under which the federal courts have created an extensive federal common law governing collective bargaining agreements.[14]

Most courts, however, have read § 302 as prohibiting only payments by an employer to union representatives, or to trust funds which do not comply with the structural requirements of subsection (c)(5)(B). These courts do not read § 302 to prohibit violations of fiduciary duties or standards of prudence in the administration of the trust fund.[15]

Such claims are governed by state law and may be brought in the state courts, "just as similar alleged conduct by trustees of other trusts, however created, may be challenged and reviewed." [16]

The majority position regarding § 302's application to maladministration of trust funds is supported by the views of most commentators,[17] the Justice Department,[18] and the Subcommittee on Welfare and Pension Plans of the Senate Committee on Labor and Public Welfare. Thus, in its Final Report on Welfare and Pension Plans Investigation, the subcommittee concluded that "there is no penalty [under § 302] for abuses [of trust funds] or maladministration." [19] A Justice Department official, testifying before the subcommittee, agreed:

"Section 302 of the Labor Management Relations Act, 1974 [1947] (29 U.S.C. 186) permits the establishment of welfare and pension funds, but does not provide any penalty for their maladministration. . . . [T]here is no requirement that the funds be efficiently managed, and no prohibition against exorbitant salaries and expenses—against milking of a fund by its promoters. As long as the fund is established in accordance with the statutory language, there is no specific statute, which makes it a Federal

12. H.R.Rep.No.91–286, 91st Cong., 1st Sess., U.S.Code Cong. & Admin.News (1969), pp. 1159–1160.

13. See, *e. g.*, Raymond v. Hoffmann, 284 F. Supp. 596, 602 (E.D.Pa.1966) ; In re Bricklayers' Local 1 of Pa. Welfare Fund, 159 F.Supp. 37 (E.D.Pa.1958).

14. See, Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

15. E. g., Bowers v. Ulpiano Casal, Inc., 393 F.2d 421, 424 (1st Cir. 1968).

16. Insley v. Joyce, 330 F.Supp. 1228, 1234 (N.D.Ill.1971).

17. Note, 72 Harv.L.Rev. 778, 780 (1959) ; Note, Protection of Beneficiaries under Employee Benefit Plans, Wash.U.L.Q. 112, 126–29 (1955) :

"Section 302(c)(5) in itself does not provide sanctions against maladministration of welfare funds. It merely sets out the conditions under which a payment to a 'representative of employees' is lawful. Embezzlement and breach of trust would seem to be exclusively subject to state regulation, if any." Regulation of Employee Benefit Plans; Activate the Law of Trusts, 8 Stan.L.Rev. 655, 661 (1956).

Contra, Note, 35 N.Y.U.L.Rev. 1181 (1960).

18. Hearings Before the Subcommittee on Welfare and Pension Funds of the Senate Committee on Labor and Public Welfare, 84th Cong., 1st Sess. (1955), pt. 6 at 902–04.

19. Senate Committee on Labor and Public Welfare, Welfare and Pension Plan Investigation, Final Report, 84th Cong., 2d Sess. (1956), p. 59.

offense for the managers of the trust to ransack or loot the trust corpus. . . . .

No remedy is provided by section 302 for abuse of the trust purposes. Unless some other Federal statute is violated, abuses must be corrected in State courts either through actions brought by employees against the trustees for breach of their duties, or criminal prosecutions for embezzlement or misapplication." [20]

■■ We think the weight of reason and authority supports the view that § 302 is not a congressional mandate to the federal courts to create federal law governing the administration of trust funds.[21] Therefore, we conclude, as has the majority of courts which has considered the issue, that § 302 of the Act does not prohibit breaches of fiduciary duty, diversion of trust funds, or similar allegations which relate solely to the maladministration of trust funds.[22] Thus, plaintiffs' claim that Rose violated his fiduciary duty to the trust beneficiaries fails to state a valid claim under the Act and we may not consider it.

■ Plaintiffs' second claim of invalidity, that the employment contract was not approved by the trustees in accordance with the terms of the trust instrument, also relates to the internal administration of the Fund, a matter governed by state law. Payments by the *Fund* to administrators, without proper trustee approval, do not violate § 302. The statute prohibits only payments made by an *employer* to a representative of its employees. Since plaintiffs rest their action solely on § 302 and not on any violations of state law, we may not consider this claim.

■ Plaintiffs' final theory of invalidity, however, does state a valid claim under § 302 of the Act. They contend that the payments made to Rose by the Fund represent payments made by an employer to a union representative, a clear violation of the Act. The hiring of Rose as administrator, plaintiffs argue, was merely the means employed by defendants to make the illegal payment. This type of allegation clearly comes within the Act. The conduct charged goes beyond mere breach of fiduciary duty to a conscious attempt by both parties to evade the Act.

■ In Arroyo v. United States, 359 U.S. 419, 79 S.Ct. 864 (1959), the Supreme Court noted that a payment ostensibly made to a fund for the lawful purposes set forth in § 302 would violate the statute if both parties to the pay-

**20.** Hearings Before the Subcommittee on Welfare and Pension Funds of the Senate Committee on Labor and Public Welfare, *supra*, at 902–04.

**21.** Moses v. Ammond, 162 F.Supp. 866, 870 (S.D.N.Y.1958); Bowers v. Ulpiano Casal, Inc., *supra*, 393 F.2d at 426; Sanders v. Birthright, 172 F.Supp. 895 (S.D.Ind.1959); Kane v. Shulton, Inc., 189 F.Supp. 882, 884 (D.N.J.1960); Holton v. McFarland, 215 F.Supp. 372 (D.Alaska 1963); Fiorelli v. Kelewer, 339 F.Supp. 796, 799 (E.D.Pa.1972).

**22.** Employing Plasterers' Ass'n of Chicago v. Journeymen Plasterers' Protective and Benevolent Society of Chicago, Local 5, 279 F.2d 92, 97 (7th Cir. 1960); Bowers v. Ulpiano Casal, Inc., *supra*; Insley v. Joyce, *supra*, 330 F.Supp. at 1231; Kroger Co. v. Blassie, 225 F.Supp. 300, 312–313 (E.D.Mo. 1964), vacated on other grounds, 345 F.2d 58 (8th Cir. 1965); Moyer v. Kirkpatrick, 265 F.Supp. 348, 351 (E.D.Pa.1967), aff'd,

387 F.2d 955 (3d Cir. 1968); Porter v. Teamsters Health, Welfare and Life Ins. Funds of Phila. and Vicinity, 321 F.Supp. 101, 103 (E.D.Pa.1970); Giordani v. Hoffmann, 295 F.Supp. 463, 470–471 (E.D.Pa. 1969); cf. Snider v. All State Adm'rs, Inc., *supra*.

Blankenship v. Boyle, 329 F.Supp. 1089 (D.D.C.1971), cited to us by plaintiffs, is not contra. In that case, although the court found that the defendants had violated their fiduciary duty to the Fund, no violation of § 302 was claimed. Jurisdiction was based upon the general jurisdiction of the District of Columbia district court, which was then in effect, 11 D.C.Code § 521, and on diversity of citizenship, 329 F.Supp. 1092, and the plaintiffs did not claim that the Act had created federal law governing fiduciary obligations. The court considered § 302 *only to* the extent of finding that it did not relieve defendants of their common law fiduciary responsibilities. 329 F.Supp. at 1094–1095.

ment knew it was a sham.[23] This is essentially what plaintiffs contend happened here. We think that if the trustees have used the structure of the trust fund to make employer payments to Rose, the statute is violated, whether the payments are direct or indirect.[24] The congressional purpose of preventing bribery and extortion in the collective bargaining process will be thwarted if we hold that such payments are legal merely because the employer makes no direct payment to an employee representative. Congress and the Supreme Court did not intend the policy of § 302 to be evaded in this manner. We proceed, therefore, to an examination of the evidence.

Until July 1, 1973, when Rose became administrator of the Fund, it was administered by the JAC teachers of the apprentice school and by Rose, as JAC chairman. Mr. Burchard, the JAC secretary, took attendance, filled out the various forms, and sent them to Rose. Between forty and forty-five students a year attended the school, which operated evenings five hours a week, from mid-September to mid-April, for a total of 144 hours a year. The school is regulated by both the federal government and the State of New York. The number of students, the training opportunities offered by the school and the complexity of the relevant regulations have all increased since the establishment of the Fund in 1967.

The Fund's income for fiscal year 1972[25] was $60,170 and disbursements totalled $15,492. In fiscal 1973, the income was $34,406 and disbursements $15,199. Gross Fund receipts for the first six months of fiscal 1974 (July 1, 1973 to December 31, 1973) were only $12,796.68, indicating that total income for 1974 might be as low as $25,000. This decrease in income is due to the re-

cent drop in hours worked by Union members, which has led to a consequent decrease in employer contributions to the Fund.

The Rose employment contract provides for payment to Rose of foreman's wages of $365 per week, expenses of $100 per week, and for contributions in his behalf to various Union funds of $123.60, for a total of $588.60 per week or $30,607 per year. Thus, the compensation to be paid Rose in the first year of the contract is likely to exceed Fund income for the same period.

The subject of retaining a full-time administrator for the Fund had been discussed by Rose and predecessors of the defendant employer trustees as early as 1970. It was not necessary to hire an administrator at that time, however, because the Fund was not yet large enough to sustain one.

In March 1973, Rose discussed with Albenda, then an employer trustee, the appointment of a Fund administrator:

"He [Albenda] stated to me [Rose] that he felt or had heard rumors that Mr. Mims was going to have problems at election time and if we were short on money in the General Fund, that if one of us become administrator, we would still be in the field, could check jobs and one thing or another, and relieve the General Fund of the expense of the second man, and I explained to Mr. Albenda at that time, I didn't think you could convince Mr. Mims that possibly he should move over and take that job or change in any way from what he was doing, and he even offered to have lunch with him and talk to him. I told him, 'I don't think it will go over.' "

At the May 4, 1973 membership meeting, Rose was removed as assistant business agent by vote of the membership. An executive board meeting followed the

23. 359 U.S. at 424, 79 S.Ct. 864.

24. See Giordani v. Hoffmann, *supra*, 295 F. Supp. at 470; Porter v. Teamsters Health, Welfare and Life Ins. Funds of Phila. and Vicinity, *supra*, 321 F.Supp. at 104.

25. During this period, the employer contribution to the Fund was 8¢ per hour.

membership meeting, and afterwards, William Mims, Union business agent and a trustee of the Fund, asked Rose to stay behind a moment because Mims wanted to talk to him. Mims said to Rose, "[w]e have been discussing any way we can get around this," apparently referring to Rose's loss of the assistant business agent job.[26] Mims suggested that Rose move into the Fund office the following Monday and assume the position of Fund administrator.

Mims testified that at this time Rose stated to him "if that is the way they want to play the game, that's the way we'll play it." Plaintiff Whitney heard Rose state his intention to "grab anything that was ready for the taking." Mims also testified that Rose said that if he should lose the election for president, he would use the Fund administrator's position "as a back-up job."

A few days after the May 4 meeting, Rose visited the Fund's attorney, Mr. O'Hara, and O'Hara drew up a contract retaining Rose as Fund administrator. Rose and O'Hara discussed the contract's terms, including compensation, which Rose suggested should be foreman's wages. The document prepared by O'Hara as a result of this meeting was essentially the same as the contract signed by the trustees and Rose, with some modifications not important here.[27]

Rose then brought the contract to Mims for his signature, but Mims was reluctant to sign. Although he thought an administrator should be appointed, Mims objected to the contents of the contract and thought:

"[I]t should have been sent out to the members and any qualified person who thought they had the qualifications for the job should be sent out letters stating as such, regardless of who the trustees might have been.

Assuming I was going to be reelected again, I think there would have been a problem on it, to be perfectly frank with you."

Rose told Mims that if he would not sign the contract, Rose, as chairman of the Fund and the JAC, would "appoint another trustee and have him sign it." Rose told Mims: "Look, I'll do what I can. I'll do what I have to do."

Rose then took the contract to Albenda, in Poughkeepsie, shortly afterwards. Albenda telephoned Mims to talk about the contract, expressing reservations about certain parts of it. Albenda asked Mims what he thought of the contract, and Mims replied: "[w]ell . . . look, it's going to come anyway. You're the people [the employer trustees] who proposed it." Albenda also remarked to Mims that "[i]t looks like you've got trouble in the camp. You've got internal trouble!" Albenda told Mims not to worry, that he would straighten everything out.

Albenda told Mims that he was reluctant to sign the contract until certain modifications were made in the contract and certain internal problems in the local Union were solved.

Rose and Albenda discussed the changes Albenda wanted made in the contract during the course of several telephone conversations. The changes were made in Albenda's office and Albenda then signed the contract. Mims and Palatnik (the other employer trustee) concurred in the changes and also signed the contract. The agreement is dated May 29, 1973.

Albenda explained to Mims that he signed the contract because he thought Mims was doing a fine job as business agent and did not want Mims to be defeated in the election for business agent.

---

26. The assistant business agent of the Union is paid, as is the business agent; the president of the Union is not.

27. These modifications appear on page 2 (two changes) and page 3 and were initialled by the parties. The typewritten changes were made on a typewriter in Albenda's Poughkeepsie office.

The evidence clearly shows a conspiracy by Albenda, Rose, and perhaps others, to divert trust fund monies to Rose, as Fund administrator, an obvious breach of their fiduciary duty to the Fund. There is no evidence, however, which shows that Rose, Mims, Albenda or Palatnik attempted to use the structure of the Fund to disguise or facilitate direct or indirect employer payments to Rose. All payments of money to Rose, as administrator, were to be made out of Fund monies, and the evidence contains no suggestion that any payments were made by any employer to Rose at any time. Although it is true that the money Rose receives as Fund administrator was originally contributed to the Fund by employers, there is no indication that Rose's salary was paid out of money specially earmarked for that purpose, rather than out of general Fund monies.

Thus, although plaintiffs have shown that defendants wrongfully sought to divert Fund monies to Rose, this conduct, as we have previously held, does not violate the statute, and plaintiffs have failed to demonstrate any conduct which does constitute such a violation. There was no evidence that the kind of bribery and extortion congress sought to prevent when it passed the Act was present here. The evidence does not show that Rose, the prime mover in acquiring the administrator's job for himself, made any threats or promises to either of the employer trustees to induce them to sign the contract, or that they demanded or expected anything in return for their signatures. The trustees' conduct constituted no more than a simple breach of their fiduciary duty to the Fund, conduct which does not come within § 302 of the Act and which presents an issue not now before us.

Since plaintiffs have failed to prove that defendants have violated the Act, they are not entitled to the declaratory or injunctive relief they seek regarding Rose's contract with the Fund, and the complaint is hereby dismissed.

So ordered.