Joseph W. HALEY and Henry Whitney, as Trustees of the International Association of Bridge, Structural and Ornamental Iron Workers, Local 417 Training and Education Fund, Plaintiffs-Appellants,

v.

Robert PALATNIK et al., Defendants-Appellees.

No. 399, Docket 74–1948.

United States Court of Appeals, Second Circuit.

Argued Dec. 4, 1974.

Decided Jan. 24, 1975.

John R. Harold, New York City, for plaintiffs-appellants.

Mitchel B. Craner, New York City (Guazzo, Silagi & Craner, P. C., Stephen E. Klausner, New York City, of counsel), for defendant-appellee Palatnik.

David W. Silverman, New City, N. Y. (Granik, Garson, Silverman & Nowicki, New City, N. Y.), for defendant-appellee Rose.

Before KAUFMAN, Chief Judge, and ANDERSON and OAKES, Circuit Judges.

OAKES, Circuit Judge:

The sole question presented by this appeal is whether the federal courts have jurisdiction to provide relief in connection with an alleged conspiracy by the trustees of a Labor Management Relations Act (Act) trust fund, to divert money from that fund to one of the union trustees.[1] Suit was brought under § 302(e) of the Act, 29 U.S.C. § 186(e), but no pendent claim under state law was asserted. The district judge, Lloyd F. MacMahon, for the United States District Court for the Southern District of New York, held that relief was available only under state law and could not be obtained in a suit resting solely upon the federal statute. Haley v. Palatnik, 378 F.Supp. 499 (S.D.N.Y.1974). Although we agree with much of his opinion which both details the facts here and expounds

the law relating to § 302 trusts, we disagree with his ultimate conclusion and reverse and remand for the reasons below.

The facts, encapsulated, are these. Pursuant to a 1967 collective bargaining agreement between the International Association of Bridge, Structural and Ornamental Iron Workers, Local 417 (the union), and several employers, an Apprentice Training Fund was set up to defray the costs of apprenticeships in the employees' trades. The fund was created in accordance with § 302(c)(6) of the Act, 29 U.S.C. § 186(c)(6), which requires, among other things, that the fund be managed by an equal number of employer and employee representatives as trustees. Willis C. Rose, the appellee, served as one of the two union trustees of the education fund. He was also the president of the union (an unpaid position) and assistant business agent for the union (a paid position). The other union trustee (and also paid union business agent) was William Mims. In 1972 the fund had income of $60,170 (in part from an employer contribution first of 8 cents, then 4 cents per union-manhour worked) and disbursements of $15,492; in 1973 it had income of $34,406 and disbursements of $15,199; and in the first six months of 1974 gross receipts of $12,796.68.[2]

In March, 1973, Rose discussed with Joseph Albenda, an employer trustee of the fund, the appointment of a fund administrator. Although the need for an administrator had been discussed as early as 1970, Rose testified that his discussion with Albenda was precipitated by Albenda's awareness that Rose (and Mims) had internal political trouble with the union members and were facing the likelihood of a difficult election. Albenda suggested that if either Rose or Mims were named administrator, the salary from the position could be used to defray the expenses incurred during an election

1. Specifically, appellants are seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 invalidating a contract between the former trustees and the union president. In addition, the appellants are seeking an injunction to restrain the present trustees of the fund (apparently including themselves) from making payments on the employment contract.

2. Indications were that the total income from the fund in 1974 would have been less than $25,000.

campaign. In short, there is every indication that Albenda, an employer representative, was at the very least interested in keeping Rose and Mims in their positions with the union.

In May, 1973, Rose was removed as assistant business agent by the union membership. He was facing another election (for president) in June, 1973, and his ouster from that position appeared imminent. After an executive board meeting immediately following the May meeting Mims suggested to Rose that the latter become fund administrator; Rose allowed that if he should lose the election for president he could use the fund administrator's position as a "back-up job." A contract between the fund and Rose as fund administrator was drawn up by union counsel and, with minor modifications, signed by Mims, Albenda and Robert Palatnik, the other employer trustee. The contract gave Rose $30,607 per year, more than the net income of the fund in 1973 and its anticipated gross receipts in 1974. Judge MacMahon found as follows:

> Albenda explained to Mims that he signed the contract because he thought Mims was doing a fine job as business agent and did not want Mims to be defeated in the election for business agent.
>
> The evidence clearly shows a conspiracy by Albenda, Rose, and perhaps others, to divert trust fund monies to Rose, as Fund administrator, an obvious breach of their fiduciary duty to the Fund.

378 F.Supp. at 507–508. But the court below went on to say that

> There is no evidence, however, which shows that Rose, Mims, Albenda or Palatnik attempted to use the structure of the Fund to disguise or facilitate direct or indirect employer payments to Rose. All payments of money to Rose, as administrator, were to be made out of Fund monies, and the evidence contains no suggestion that

any payments were made by any employer to Rose at any time. . . .

> . . . The evidence does not show that Rose, the prime mover in acquiring the administrator's job for himself, made any threats or promises to either of the employer trustees to induce them to sign the contract, or that they demanded or expected anything in return for their. signatures.

378 F.Supp. at 508. Accordingly, the court held that:

> The trustees' conduct constituted no more than a simple breach of their fiduciary duty to the Fund, conduct which does not come within § 302 of the Act and which presents an issue not now before us.

*Id.*

The contract was dated May 29, 1973. Rose remained as president of the union until July 1, 1973, after defeat in the June 30 election. He assumed his duties as fund administrator on July 2, 1973.

▆▆▆ We agree with the district court's conclusion that conduct constituting no more than a simple breach of fiduciary duty to a § 302(c) trust does not come within the prohibition of the Act per se. Bowers v. Ulpiano Casal, Inc., 393 F.2d 421, 424–426 (1st Cir. 1968). *See* cases cited in Haley v. Palatnik, 378 F.Supp. at 505 n. 22; Note, 72 Harv.L.Rev. 778, 780 (1959). *But see, e. g.,* Lewis v. Mill Ridge Coals, Inc., 298 F.2d 552, 558 (6th Cir. 1962). Section 302(e) gives district courts jurisdiction only "to restrain violations of this act." *See* Bowers v. Ulpiano Casal, Inc., 393 F.2d at 425–426.

But the conduct here, in our view, amounted to a "violation of the act." The Act, which was principally intended to protect the collective bargaining process by eliminating the corruptive influence of side payments by employers to union representatives, 2 U.S.Code Cong. & Admin.News, 86th Cong., 1st Sess., at 2326–2327 (1959),[3] prohibits anyone

---

**3.** In addition, the Act was intended to prohibit employee representatives from engaging in extortion against their employers. 29 U.S.C. § 186(b). *See generally* 2 U.S.Code Cong. & Admin.News, 86th Cong., 1st Sess., at 2328–2331.

who acts in the interest of an employer to . . . agree to pay, lend, or deliver, any money or other thing of value (1) to any representative of any of his employees . . . or (4) to any officer or employee of a labor organization . . . with intent to influence him in respect to any of his actions, decisions, or duties . . .

To be sure, the provisions of § 302 are not applicable under subsection (c) thereof, 29 U.S.C. § 186(c)(5) and (6):

(5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents . . .. *Provided*, That . . . (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; . . .

(6) with respect to money or other thing of value paid by any employer to a trust fund established by such representative for the purpose of pooled vacation, holiday, severance or similar benefits, or defraying costs of apprenticeship or other training programs: *Provided*, That the requirements of clause (B) of the proviso to clause (5) of this subsection shall apply to such trust funds. . . .

■ Literally construed, the contributions made by the employer were "to a trust fund" under clause (6) and concededly the provisions of clause (B) of the proviso to clause (5) were met. But this does not end the case here, since it was the employer representatives who arranged for payments to Rose from the fund. There is nothing to require that, in order to constitute a violation of § 302(a) and (b) the moneys agreed to be paid to the union representative or official be paid from the employer's funds. United States v. Iozzi, 420 F.2d 512, 515 (4th Cir. 1970), cert. denied, 402 U.S. 943, 91 S.Ct. 1607, 29 L.Ed.2d 111 (1971). While the district court relied on the fact that none of the employer's contributions were specifically earmarked for Rose's use, this is not required. What the Act does require for a violation is that an employer or a representative of the employer pay, or agree to pay, a union official, with intent to influence him in his actions, decisions or duties.

■ Albenda and Palatnik, both employer representatives, agreed to the contract with Rose, a union representative. Without Albenda's and Palatnik's assent, there could have been no contract. The only remaining question is whether there was evidence to show that the employer representatives acted, in the language of the Act, "with the intent to influence" Rose in his conduct as a union representative. As has been noted, Judge MacMahon found that there was neither proof that Rose made threats or promises to induce the employer trustees to sign the contract nor proof that the employer made demands on Rose. But Albenda initiated the discussion with Rose regarding appointment of a fund administrator at a time when Rose was facing ouster by the union.

The inference that Albenda wanted to retain Rose in his union post for the employer's benefit is one that is not altogether farfetched. Not insignificant is Albenda's explanation to employee trustee Mims that Albenda signed the contract because he thought Mims was doing a fine job as business agent and did not want him to be defeated in the upcoming union election. 378 F.Supp. at 507.[4] As we read the trial court's opinion, Albenda's actions were at the very least an attempt to curry favor with Mims and Rose. If this was the purpose, and it was to influence them favorably in conduct of union business with the employer, there was a violation of the Act.

Arroyo v. United States, 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959), held that embezzlement by a union official of funds paid to a trust fund was not a violation of the Act. The Court pointedly noted, however, that "The good faith of the employers in delivering the two checks to the petitioner—their intent that the money go to the welfare fund created by the collective bargaining agreement—was not questioned . . ." 359 U.S. at 423, 79 S.Ct. at 867. Here the intent was clear, and the trial court found, that the money going to the education fund, or a major part of it, would be diverted to the personal profit of the union official. As the Court in *Arroyo* said, "Both [representative and employer] would be guilty if the payment were ostensibly made for one of the lawful purposes specified in § 302(c) *if both knew that such a purpose was merely a sham.*" 359 U.S. at 424, 79 S.Ct. at 867 (emphasis added). This seems to us exactly what may have here been involved—a sham. Not only did the trustees agree to aid Rose after the loss of his paying union job, but the salary

agreed upon, $30,607 per year, was in excess even of the gross receipts, let alone the net income of the fund under the 4 cents per employee hour employer contribution in effect at the time of the execution of the agreement. At that time the trustees were plainly aware that every cent to be paid by the employer would go to Rose. Which is not to say that, for relief to be available, it is necessary that every cent paid by the employer go to the union representative; it is enough that both employer and union representative knew the purpose of the payment to the fund was a sham or that the fund was simply a conduit for the employer payment.

To hold otherwise would be to render the Act practically useless. Trust funds would with employer-union agent connivance become a means to siphon from the employer payments to the union official who would thus become recipient of the employer's (or his trustee representatives') bounty.

■ Nor is this to say that we construe the federal statute here in issue to open the federal court to suits relating to management of LMRA trust funds. Where payments are lawfully made in good faith by the employer to the trust fund so that the provisions of § 302(c) come into play, the doors of federal court remain shut and breaches of fiduciary duty occurring thereafter are not violations of the old federal law.[5] Bowers v. Ulpiano Casal, Inc., *supra.* But where, whether or not as a result of or in connection with a breach of fiduciary duty, the *employer* or his representative *pays or agrees to pay,* even indirectly through the use of trust funds, a union representative for a prohibited purpose, the Act applies.

---

**4.** Although Rose alone was to be paid as the fund administrator, the testimony indicated that Mims would benefit from Rose's accepting the position. With Rose in a better financial position, more money would apparently have been made available to Mims in connection with his own union election.

**5.** The recently enacted Pension Reform Act, Pub.L. No. 93–406, §§ 401–05 (Sept. 2, 1974), does create a federal cause of action for breach of fiduciary duties in connection with this kind of plan, but that act evidently does not apply to the conduct involved in this suit since its effectiveness, § 414, is subsequent thereto.

While it could be argued that Rose was not a representative or official of the union at the time he assumed his duties as fund administrator, the employer trustees "agreed to pay" him while he was still one, president, and it is that agreement which § 302(a) prohibits.

We therefore remand for findings on the questions whether Albenda and Palatnik, or one of them, intended to influence Rose or Mims, or both of them, in respect to any of their actions, decisions or duties as union representatives, a matter which the findings below insufficiently explicate.

Judgment reversed and cause remanded.